UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

UNITED STATES OF AMERICA

V.                                                          18 CR 270 (CM)

STANLEY ROGERS,

        Defendant.

------------------------------------------------------------x

DECISION AND ORDER DENYING MOTION FOR COMPASSIONATE RELEASE

McMahon, C.J.:

    Stanley Rogers was sentenced to 37 months' imprisonment for conspiring to rob an armored car in Manhattan's diamond district. He is currently serving his sentence in the Hazelton Federal Correctional Institution. His projected release date is November 10, 2020.

    On May 29, 2020, Rogers filed the instant motion for compassionate release, arguing that he is at a high risk for infection for COVID-19 because of the stroke he suffered in 2017 and because he also suffers from hypertension. (Def. Mem. at 2).

    The motion is denied.

<u>Compassionate Release</u>

    Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. Once such circumstance is the so-called compassionate release provision, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling circumstances." § 3582(c)(1)(A)(i).

1

A motion under this provision may be made by either the Bureau of Prisons or a defendant, but in the latter case only "after the defendant has *fully exhausted all administrative rights* to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* (emphasis added). Thus, where a compassionate release motion is brought by a defendant who has not "fully exhausted all administrative rights," the district court "may not" modify his term of imprisonment.

Once a defendant has exhausted administrative remedies, with respect to the substantive determination, and in addition the statutory requirement that the Court consider the factors set forth in Section 3553(a), the United States Sentencing Guidelines contain a provision, Section 1B1.13, applicable to motions for sentencing reductions pursuant Section 3582(c)(1)(A). That section provides, in relevant part, that a reduction in sentence may be appropriate if the Court determines that--

(1) (A) Extraordinary and compelling reasons warrant the reduction; or

(B) The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2) The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) The reduction is consistent with this policy statement. U.S.S.G. § 1B1.13.

Subsection (1)(B) is inapplicable. Subsection (1)(A), which relates to "the Application Notes to Section 1B1.13, describe the circumstances under which "extraordinary and compelling reasons" exist. *See id.* § 1B1.13 comment (n.1). The only relevant provision reads as follows:

(A) Medical Condition of the Defendant.—

    (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia

    (ii) The defendant is—

        (I) suffering from a serious physical or medical condition,

        (II) suffering from a serious functional or cognitive impairment, or

        (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self- care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* § 1B1.13 comment (n.1).

As the proponent of the Motion, Rogers bears the burden of proving that "extraordinary and compelling reasons" exist and that he is entitled to the relief he seeks. *See, e.g., United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.").

<u>Rogers' Motion in the Bureau of Prisons</u>

Rogers submitted a request for compassionate release to the warden of FCI Hazelton on April 2, 2020. (Def. Ex. B). Because more than thirty days have passed without a response from anyone at the Bureau of Prisons ("BOP"), he has satisfied the exhaustion requirement and his compassionate release motion is properly before the court. *See* 18 U.S.C. § 3582(c).

The Motion Before the District Court

Rogers claims, as he did in his motion to the BOP, that the stroke he suffered in 2017, his high blood pressure, and moderate kidney disease, combined with the COVID-19 epidemic make him "particularly vulnerable to the virus." (Def. Br. at 2). He argues that the risk of infection and accelerated transmission of COVID-19 within prisons generally is extraordinarily high, and that he "is in real danger with each day that passes." *Id*.

While Rogers is not in particularly good health, he does not fall into that narrow band of inmates whose poor health overrides all other concerns, establishing an extraordinary and compelling reason to grant release. Rogers does not qualify for compassionate release under any provision of the applicable Sentencing Guideline, Section 1B1.13: he is not "suffering from a terminal illness" nor is he "suffering from a serious . . . medical condition" or "functional or cognitive impairment" that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not likely to recover." *Id*. According to BOP Medical records, Rogers is being treated by the medical staff at FCI Hazelton for his hypertension and kidney disease with apparent success. (*See* Govt. Ex. B at pp. 3, 10-11 of 102). It is quite possible that Rogers is receiving the most comprehensive health care he has received in a long time.

And Rogers' health concerns, such as they are, must be viewed in the context of the actual threat of contracting COVID-19 at FCI Hazelton. The measures BOP has taken to mitigate the proliferation of the virus in its facilities appear to have been quite successful at FCI

4

Hazelton. Indeed, of the 1,755 total inmates at FCI Hazelton, there have been no reported COVID cases.[1]

In regard to 18 U.S.C. § 3142(g) (defendant's danger to the community), which this court must consider before granting compassionate release, Rogers' criminal conduct in the instant case, and his history of violent crimes, suggest that he will pose a serious risk to the community whenever he is released.

In the present case, Rogers told an undercover agent ("UC") of his plan to rob a Federal Express truck that Rogers believed contained diamonds and other precious gems. (PSR ¶ 8). According to Rogers, he and others were intent on using a sedative on the truck's guards in order to incapacitate them during the robbery. (PSR ¶ 9). Rogers sought to enlist the UC into his robbery scheme, telling him that the heist would yield approximately $3,000,000 in precious gems. (PSR ¶ 10, 11). Rogers drove the UC to the area where he wanted to stage the robbery and showed the UC surveillance photos of the specific Federal Express truck that he intended to target. (PSR ¶ 11, 14). Rogers explained that he was working with an employee of Federal Express who was providing him with information about the truck, its contents, and the route it traveled. (PSR ¶ 13). Rogers told the UC that he wanted to kidnap one of the guards after administering the tranquilizer then drive the truck, its contents, and the kidnapped guard to a predetermined location where the defendant and others would remove the gems. (PSR ¶ 14). Rogers told the UC that he would be carrying a 9MM pistol during the robbery. (*Id.*).

---

[1] According to the Government, BOP counsel confirmed the lack of COVID cases at FCI Hazelton on June 4, 2020. The defendant cites to the BOP website for the erroneous assertion that one staff member has tested positive for the virus at FCI Hazelton. (Def. Br. at 7). However, the website's reference is to USP Hazelton, which is a separate facility from the medium security facility at FCI Hazelton. *See* https://www.bop.gov/coronavirus/ (last visited June 4, 2020).

Rogers made two payments to the UC totaling $500 toward the purchase of the sedative the defendant intended to use during the robbery. (PSR ¶ 12, 14). As the planning of the robbery progressed, the defendant told the UC that he suspected one of the participants in the conspiracy was working with the Government and informed the UC of his plan to kill the suspected informant by administering a lethal dose of the sedative he was to purchase from the UC. (PSR ¶ 16, 17).

Rogers was arrested before his plan could be brought to fruition. Nobody was hurt—this time.

On August 22, 1989, a vehicle the defendant was traveling in was stopped for a traffic infraction on the New Jersey Turnpike by a State Trooper. There were three men in the car. The defendant sat in the rear seat on the driver's side of the auto with a towel over his lap. As the Trooper spoke with the car's driver, he exited the vehicle at the Trooper's direction. At the same time, the front seat passenger jumped out of the passenger's side door and fled on foot. The driver soon followed, and as the Trooper started to give chase, the defendant exited the car on the driver's side with a MAC 10 machine pistol that had been hidden under the towel on his lap. The defendant opened fire and shot the Trooper six times as the officer attempted to take cover. Rogers shot the Trooper three times in the back, once in the shoulder, once in the hand, and once in the thigh. It was only after the Trooper was shot and down on the ground that he was able to draw his weapon and return fire. Nevertheless, Rogers continued to fire at the Trooper even after he was down. At one point, the defendant reloaded his gun so that he could continue firing at the officer. After Rogers shot the Trooper he stole his marked car and crashed through a toll plaza where he carjacked a motorist's vehicle at gun point.

Rogers was ultimately convicted of attempting to kill the State Trooper. He spent 16 years in state prison.

Less than eighteen months after he was released from prison for shooting the trooper, Rogers was arrested again for possessing firearms under circumstances that suggested an intent to use those firearms. (PSR ¶ 34). He was sentenced to five years in prison.

After spending nearly 22 years in prison, Rogers was not done. He hatched the plan in the instant case that would have likely involved, at a minimum, serious physical injury, and quite possibly, the death of a Federal Express employee. As I said at sentencing:

> He did not learn his lesson, and society was not protected after he got out of jail the first time. He clearly did not learn his lesson, and society was not protected after he got out of jail the second time."
>
> \*\*\*\*
>
> . . . what you were willing to do to [the Federal Express driver] in order to get property that was not yours, for your own gain and benefit, was heinous, was hideous, and you need to go to a federal correctional institute and spend some real time reflecting on what it was that you were willing to do.

(Sentencing Tr. at 17:16-19; 18:23-19:3). Even if Rogers had otherwise established "extraordinary and compelling reasons" warranting his release (he has not), his demonstrated willingness to commit serious life-threatening acts of violence would counsels against release.

The motion is denied.

Dated: June 15, 2020

*[signature]*

Colleen McMahon
Chief Judge

BY ECF TO ALL PARTIES